USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 1/9/17

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------------X
RICHARD A. HARLEY, *et al.*,           :
                                       :
                          Plaintiffs,  :
                                       :          1:15-cv-8898-GHW
              -v -                      :
                                       :          MEMORANDUM OPINION
THE BANK OF NEW YORK MELLON,           :          AND ORDER
                                       :
                          Defendant.   :
--------------------------------------------------------------X

GREGORY H. WOODS, United States District Judge:

Over the course of many years, the plaintiffs in this action, members of The Retirement

Plans Committee as plan administrator of the WellSpan Health System ("WellSpan") Pension Plan,

invested pension funds using the services of the defendant, The Bank of New York Mellon ("BNY

Mellon"), as custodial trustee. For over a decade, BNY Mellon provided a high level of customer

service to WellSpan, upon which WellSpan came to rely. But turnover in the BNY Mellon customer

service team in 2013 left WellSpan in the hands of a BNY Mellon service team whose performance

fell well below the standard to which WellSpan had become accustomed. Because of a series of

miscommunications between WellSpan and BNY Mellon, $15 million that WellSpan wanted to

invest in equities was, instead, invested in cash equivalents. WellSpan lost over $1.7 million by the

time the mishap was identified and corrected. WellSpan seeks to recover that amount in this case.

Because BNY Mellon was acting as a directed trustee under ERISA, and its service met the

minimum level required of a directed trustee, it is not liable under ERISA, despite the marked

decline in that level of service. The higher level of performance that BNY Mellon provided over the

years exceeded the minimum level required under ERISA. When the tide receded, it left exposed a

number of gaps in WellSpan's internal procedures for which BNY Mellon does not bear

responsibility.

Plaintiffs brought this action alleging a single count of breach of fiduciary duty in violation of 29 U.S.C. § 1104(a)(1)(B).  The Court held a bench trial from October 31, 2016 to November 4, 2016.  Having considered the parties' pretrial submissions and the evidence presented at trial, the Court makes the following findings of fact and conclusions of law pursuant to Rule 52(a) of the Federal Rules of Civil Procedure.

## I.   FINDINGS OF FACT

### A.  WellSpan and the Plan

WellSpan is a not for profit corporation headquartered in York, Pennsylvania.  It provides healthcare services in central Pennsylvania through a number of hospitals and affiliated health care facilities.  WellSpan sponsors the WellSpan Health System Pension Plan (the "Plan"), which provides benefits to current and former employees of WellSpan and a variety of its affiliates.  In 2013, the Plan had over 4,800 actively employed plan participants.

A significant amount of money is invested in the Plan.  At the end of September 2013, the Plan held over $600 million in assets.  WellSpan makes annual contributions to the Plan for the benefit of its employees; in 2013 alone, WellSpan contributed $57,200,000 to the Plan.  Investments in the Plan, and the income they generate, are held for the benefit of the Plan's participants to pay for their retirement benefits.

Ultimate responsibility for oversight of the Plan's investment portfolio rests with the WellSpan Health Finance and Investment Committee (the "Investment Committee").  Among other things, the Investment Committee approves and adopts the Plan's investment policy statement, and makes asset allocation decisions.  The Investment Committee also approves any recommended changes in managers included in the portfolio, and reviews the performance of the Plan's investments.  A separate WellSpan committee, the Retirement Plans Committee, serves as plan administrator for the Plan.  That committee is responsible for overseeing administrative aspects of the Plan such as the preparation of disclosure documents and governmental filings.

A small team of full-time employees at WellSpan are devoted to the management and oversight of the Plan. Rick Harley, WellSpan's Vice President, Treasury Management, is the most senior; he reports to Michael O'Connor, WellSpan's chief financial officer. Since 2000, Mr. Harley has provided day to day oversight of WellSpan's investment program. Mr. Harley is a member of the Retirement Plans Committee. Joey McCoy serves as the Controller and Director/Manager of Treasury for WellSpan. In that position working with Mr. Harley, he too has born the responsibility for the day to day management of WellSpan's investment program. Like Mr. Harley, Mr. McCoy has served in his role for a long time—he began to work with WellSpan's investment portfolio before BNY Mellon became the Plan's trustee in 1999. Mr. Harley and Mr. McCoy are responsible for tasks such as rebalancing the portfolio, managing incoming cash contributions to the Plan by WellSpan, and consulting with the Plan's consultants on these topics and others.

While WellSpan employs a handful of professionals to manage its investment portfolio, it relies on an outside independent consulting firm for investment advice. Since October 1, 2012, NEPC, LLC ("NEPC") has served as the Plan's investment consultant. In that role, NEPC makes recommendations to WellSpan about the Plan's investment policy broadly and advises WellSpan regarding asset allocation and portfolio rebalancing. It also recommends investment managers with which the Plan can invest Plan assets. Kathy Ann ("KC") Connors has been WellSpan's primary point of contact on the NEPC service team since 2012. Ms. Connors, an experienced investment professional, provided guidance to WellSpan regarding its portfolio management, and, later, as described below, helped to guide WellSpan in its response to the failed investment direction that generated this litigation.

### B. BNY Mellon and its Relationship with the Plan

BNY Mellon is an investment company that acts, among other things, as a trust and custody services provider. BNY Mellon is the successor to a merger between The Bank of New York and Mellon Financial Services Corporation. BNY Mellon operates its custodial business from a number

of locations; the bank employees involved in this case worked in BNY Mellon's offices in

Pittsburgh, Pennsylvania.

Because this case turns on the propriety of BNY Mellon's response to an instruction from

WellSpan, it is necessary to describe in some depth the structure of the relationship between BNY

Mellon and the Plan, and the scope of BNY Mellon's responsibilities with respect to the Plan.  The

relationship between BNY Mellon and WellSpan is governed by a Master Trust Agreement (the

"Master Trust Agreement"), which was entered into on July 1, 1999.  The Master Trust Agreement

appointed BNY Mellon to serve as trustee for a master trust established by the agreement.[1]  The

Master Trust can be segregated into a number of separate funds.[2]

---

[1] Section 1.1 of the Master Trust Agreement provides as follows:

> 1.1    The Master Trust.  The Company hereby establishes with the Master Trustee a trust (hereinafter referred to as the "Master Trust") which shall comprise all of the funds and other assets deposited herewith and held by The Bank of New York under this Trust Agreement, together with such other sums of money and such property acceptable to the Master Trustee as shall from time to time be paid or delivered to the Master Trustee hereafter, all investments made therewith and proceeds thereof and the earnings and profits thereon.  All such funds and property, together with such investments, proceeds and earnings and profits, less the payments or other distributions which, at the time of reference, shall have been made by the Master Trustee as authorized herein, are referred to as the "Master Funds."  This Master Trust shall hereafter constitute a part of each of the Participating Plans.

[2] Section 1.2 of the Master Trust Agreement provides as follows:

> 1.2    Establishment of Separate Funds.  The Master Fund shall consist initially of a single fund.  At any time and from time to time the Master Trustee shall, if so directed by WELLSPAN HEALTH BOARD OF DIRECTORS, the party that under the terms of each of the Participating Plans is the named fiduciary with respect to control or management of the operation and administration of the Participating Plans (hereinafter referred to as the "Named Fiduciary"), establish within the Master Fund one or more investment funds, each of which shall be invested or reinvested as provided in Section 2.  The term "Fund", as used herein, shall mean the initial fund or any other investment fund so established, depending upon the fund to which such provision is being applied at the time, and the term "Master Fund" shall refer to all such funds in the aggregate.  The functions of the Named Fiduciary may be divided among more than one person or persons (in which case the term "Named Fiduciary" shall refer to any such person or persons, as the context requires), and the same person or persons may serve as the Named Fiduciary and the Investment Committee and/or the Administrative Committee as hereinafter defined.  The Master Trustee shall hold, manage, administer, value, make purchases and sales for, distribute, account for, and otherwise deal with each Fund separately.

Critically, the Master Trust Agreement permits alternative mechanisms for the management of investments in investment funds created within the master trust.[3]  If BNY Mellon has discretion to manage funds in a particular fund, the fund is treated as a "Discretionary Fund."  However, if the fund is managed by an investment manager or an investment committee appointed by WellSpan, the fund is considered to be a "Directed Fund."  There is no dispute that the Plan was a "Directed Fund"; investments in it were managed by WellSpan's Investment Committee.  In addition, WellSpan never advised BNY Mellon that BNY Mellon had discretion to manage funds subject to the Master Trust Agreement.  As will be discussed in more detail below, because WellSpan, not BNY Mellon, was responsible for investment decisions with respect to the Plan and its assets, BNY Mellon acted as what is known in the language of the Employee Retirement Income Security Act ("ERISA") as a "directed trustee" with respect to the Plan and its assets.

In addition to the Plan, BNY Mellon acted as custodian for a separate fund established pursuant to the Master Trust Agreement, which is relevant to this case.  That other fund contained WellSpan's non-ERISA reserve or "endowment" funds.  WellSpan employees referred colloquially to that separate fund for which BNY Mellon acted as directed trustee as "Master Trust" assets.  Because both the Plan and the non-ERISA assets were custodied by BNY Mellon pursuant to the Master Trust Agreement, this opinion refers to that separate fund as the "Non-ERISA Fund."

---

[3] Section 2.1 of the Master Trust Agreement provides as follows:

> 2.1     Appointment of Investment Managers and Investment Committee.  At the time each Fund is established, and from time to time thereafter, the Company shall determine and advise the Master Trustee whether the investment of such Fund is to be managed (a) by the Master Trustee in its sole discretion, (b) by an investment manager who (i) is duly appointed by the Named Fiduciary, and (ii) qualifies as an investment manager under Section 3(38)(B) of the Act (an "Investment Manager"), or (c) by an Investment Committee appointed by the Named Fiduciary (the "Investment Committee").  Any Fund that is managed by the Master Trustee is hereinafter referred to as a "Discretionary Fund", and any Fund that is managed by an Investment Manager or Investment Committee is hereinafter referred to as a "Directed Fund."

### C.  Investment Directions Under the Master Trust Agreement

WellSpan provided BNY Mellon with instructions regarding how to invest Plan assets.  As trustee, BNY Mellon custodied the assets of the Plan, but the bank was not responsible for making decisions about how those assets were invested.  The Master Trust Agreement specified that "in the absence of directions or authorization from the . . . Investment Committee, the Master Trustee shall have no power, duty or authority to invest any Directed Fund."  Master Trust Agreement §2.3(b).  As a result, WellSpan was required to provide "investment directions" to BNY Mellon regarding the investment and allocation of assets in the Plan.  WellSpan was aware that it, not BNY Mellon, bore the responsibility for investment decisions with respect to the Plan.  As Mr. McCoy testified at trial, the "decision to invest rests solely with WellSpan Health," and WellSpan did not have an expectation that BNY would "question the wisdom" of proposed investments.

A number of documents dictated the form and substance of instructions from WellSpan to BNY Mellon.  Among other things, the Master Trust Agreement required that investment directions be in writing.  Master Trust Agreement §§ 2.3(b), 12.  Instructions could also be made only by properly-designated representatives of WellSpan.  A resolution adopted by the Board of Directors of WellSpan authorized a number of people, including Michael F. O'Connor, to designate the people who were authorized to issue instructions under the Master Trust Agreement.  In turn, Mr. O'Connor of WellSpan provided to BNY Mellon the names and signature exemplars of WellSpan employees who were authorized to direct BNY Mellon to implement asset transfers and investments.

The signature authorization form in place at the time of the events at issue here was provided by Mr. O'Connor to Ms. Jessica Strub—the employee at BNY Mellon responsible for the client relationship with WellSpan—and was dated June 6, 2013.  That letter authorized a number of individuals at WellSpan to implement asset transfers and investments, including Mr. Harley and Mr. McCoy.  The letter provided signature exemplars for each of those and other authorized employees.

The letter stated that "instructions will require the written approval" of one of the identified individuals, with exceptions that are not relevant here.  The letter also noted that "BNY Mellon procedures will require a secondary callback on all 'funding' directives."

The form also identified people who were authorized to make payments of benefits and fees from Plan assets.  For payments, the form distinguished between "repetitive" payments—principally periodic payments of fees to portfolio fund managers, trustees, and investment consultants—and other disbursements.  "Repetitive" payments required the approval of only one authorized signatory, whereas other disbursements required the approval of two.  Also, the form set threshold dollar amounts that would trigger the requirement for a confirmatory callback from the bank, but clarified that callbacks for repetitive payments could be eliminated once the payment process was established and confirmed.

At the end of the June 6, 2013 letter, Mr. O'Connor wrote:  "This authorized signature form supersedes all prior certifications . . . ."  In that phrase, Mr. O'Connor properly described the letter as what it was, an "authorized signature form."  At trial, Plaintiffs highlighted this document, arguing that it demonstrated BNY Mellon's failure to provide WellSpan with concrete guidance about how to provide instructions, but Plaintiffs make more of the document than it is.  It is merely what it purports to be, and what Mr. O'Connor called it—a signature authorization form.

Investment directions were provided by WellSpan to BNY Mellon by fax in accordance with the terms of the Master Trust Agreement.  Section 12 of the Master Trust Agreement stated that "all orders, requests and instructions to the Master Trustee . . . shall be in writing, by telecopy or by any other electronic means using a code for the authorization of messages, and signed or transmitted by an authorized representative . . . ."  Other than the requirements that investment directions be made by authorized representatives in writing, by fax or other electronic means, the Master Trust Agreement provided no specific guidance regarding the content or form of investment directions.

The Master Trust Agreement contained several provisions that limited BNY Mellon's

responsibilities, and liability, in connection with its implementation of instructions provided by

WellSpan.  In particular, Section 8.2 of the Master Trust Agreement, titled "No Duty to Review,"

provided, among other things that

> the Master Trustee shall be under no duty or obligation to review any investment
> or reinvestment made or received at the direction of an Investment Manager or
> the Investment Committee nor to make any recommendation as to the
> disposition or continued retention thereof.  Without limiting the generality of the
> foregoing, in the case of any transaction which is both directed by and executed
> by or through an Investment Manager or the Investment Committee, the
> Investment Manager or Investment Committee shall have entire responsibility for
> assuring that the transaction does not violate the prohibitions of any applicable
> state or federal law, including Sections 406 and 407 of the Act.

In addition, Section 12 of the Master Trust Agreement provided that

> all orders, requests and instructions to the Master Trustee from an Investment
> Manager or the Investment Committee shall be in writing, by telecopy or by any
> other electronic means using a code for the authorization or messages, and signed
> or transmitted by an authorized representative of the Investment Manager or
> Investment Committee, and the Master Trustee shall be fully protected in acting
> in accordance with any such order, request, or instruction.  The Master Trustee
> shall have the right to rely on and shall be fully protected in acting in accordance
> with any resolution, order, request or instruction which it believes to be genuine
> and which purports to have been signed or transmitted in accordance with this
> Section.

BNY Mellon was also indemnified for its service as trustee for any claim brought against it in

connection with the performance of its duties under the Master Trust Agreement.  Master Trust

Agreement § 6.4.  Excluded from the scope of this indemnification obligation, however, are

liabilities arising under ERISA.  Master Trust Agreement § 6.5.  Plaintiffs' claims here are limited to

liability asserted under that statute.

As noted in the June 6, 2013 signature authorization form, BNY Mellon policy required

callbacks to confirm many investment directions.  In a callback, a BNY Mellon representative who

received a written direction from WellSpan would call an authorized person from WellSpan to

confirm the direction.  Callbacks were recorded by BNY Mellon; several recordings of callbacks

were presented during trial.  BNY Mellon's policy in connection with investments by WellSpan was

that all investments that required a wire transfer outside of the bank of more than $50,000 had to be confirmed in a callback.  Certain investments, however, did not require that the bank wire funds outside of the bank.  Those transactions could be implemented by an "internal transfer" between accounts maintained by BNY Mellon.  For those transactions, BNY Mellon did not require confirmation by callback with an authorized WellSpan employee.  Instead, a second BNY Mellon employee would double-check the written instructions provided by WellSpan before money was moved.

Over the course of its many years working with BNY Mellon, WellSpan employees learned that certain transactions required wire transfers, and some were instead implemented through internal transfers, and that callbacks were required for some transactions.  However, despite over a decade working with day to day responsibilities as fiduciaries of the Plan, the responsible WellSpan employees did not learn which was which.  For years, they were sheltered from their persistent ignorance by the work of a particularly effective client team at BNY Mellon—until the events that led to this litigation.

### D.  BNY Mellon's Implementation of Investment Directions Generally

For over 14 years, WellSpan worked effectively with BNY Mellon and its client service team. At the time of the events relevant to this case, Ms. Strub was an account manager responsible for not for profit clients, including WellSpan.  Ms. Strub reported to Dean Schavolt, a managing director, who in turn reported to Brian Chorba.  Ms. Strub was responsible for the overall coordination of the relationship between BNY Mellon and WellSpan.  She coordinated the internal BNY Mellon operating teams that provided services to WellSpan.  As the manager for the entire client relationship, however, Ms. Strub did not directly implement investment directions; that work was directed to members of a specialized team within BNY Mellon.

The unit at BNY Mellon responsible for the implementation of WellSpan's investment directions was called "Client Accounting and Reporting Services," which was referred to within the

bank by its acronym as "CARS." Natalie Mansell was the unit manager of BNY Mellon's CARS unit. She had been employed in that position for 25 years. Ms. Mansell was involved with WellSpan since 2009. Over the years, a number of CARS team members were assigned to the WellSpan account, working beneath Ms. Mansell. The CARS unit servicing WellSpan experienced relatively high turnover of CARS specialists because it was an entry-level position. Employees in the CARS unit, including more senior employees like the employee responsible for the investment direction at the heart of this case, were not salaried professionals; instead, they were paid hourly. The CARS representatives who serviced the WellSpan Plan from October 1, 2010 through April 2013 included Nancy Bognar, Matt Hoetzlein, and Kate Conner. In April 2013, Ms. Conner was replaced by Erik Buczynski, whose work is described in more depth below.

One useful client service provided to WellSpan by Ms. Strub and the BNY Mellon team was the creation of an account schematic (the "Account Schematic"), a graphic representation of all of the investment vehicles in which the Plan could invest. On October 2, 2010, Ms. Strub emailed the Account Schematic to Mr. Harley and Mr. McCoy. The email also included a similar schematic for the Non-ERISA Fund.

In the Account Schematic, each investment vehicle was represented by a box in which the name of the manager appeared, together with its corresponding BNY Mellon account number. In 2013, the Plan had the ability to invest assets with 20 different investment managers representing different investment strategies. Similarly, the Non-ERISA Fund had the ability to invest assets with 20 different investment managers. The Account Schematic grouped the accounts and investment managers identified in each box under separate headings according to their overall investment class. Those investment classes were: "Domestic Equity," "Domestic Fixed," "Global Equity," "Private Equity," "Alternative Investments," "Real Estate," and "Commodities." A separate heading was included for "Cash." While a number of boxes were depicted under each of the other investment class categories, only one account was designated for "Cash" —the "Cashflow" account (account

number WSLF 1001002).

The Account Schematic also included a key containing abbreviations that identified the nature of each investment fund illustrated on the chart, as classified by BNY Mellon: Active ("A"); Limited Partnership ("LP"), Mutual Fund ("MF"), Commingled Fund ("CF"), Real Estate ("RE"), Guaranteed Fund – Annuity ("GF"), and Cash ("C"). For example, the "Cashflow" account was designated with a "C."

The Account Schematic depicted two funds managed by LSV Asset Management, one of the investment managers selected by WellSpan. The first was a domestic equity investment called "LSV Asset Management," account number WSLF2001012. LSV Asset Management was designated as "Active" on the Account Schematic. The second was a global equity investment vehicle called "LSV International Value," account number WSLF4001012. That fund was designated as a "Commingled Fund" on the Account Schematic.

WellSpan frequently referred to the Account Schematic when preparing investment directions. At trial, Plaintiffs highlighted the fact that the Account Schematic did not provide information regarding the content of investment directions required for each fund depicted, in addition to the account number and account type. In particular, Plaintiffs fault BNY Mellon for failing to indicate in the Account Schematic which of the various investment funds required wire transfers in order to implement investment directions. For reasons that the Court will present, while that information could have been helpful, BNY did not have a duty to provide it in the Account Schematic. Plaintiffs had many opportunities to learn what investment classes required wire transfer instructions, but they did not do so.

WellSpan issued standing instructions to BNY Mellon to "sweep" any uninvested cash in any account into the Federated US Treasury Cash Reserves Fund, a money market mutual fund. This money market mutual fund was referred to within BNY Mellon as a "sweep vehicle." Unlike cash, the money market fund provided a small yield. The sweep agreement provided that BNY

Mellon was "authorized and directed to invest any available cash" in the Plan's account in the "Federated US Treasury Cash Reserves Fund #125."[4]  Uninvested cash in any given account within the Plan would be swept daily into the money market vehicle—in other words, invested in the money market—but the amount remained credited to the account from which the cash was swept. It was not transferred to the separate "Cashflow Account" shown on the Account Schematic.

Over the years, a pattern developed regarding the implementation of investment instructions from WellSpan by BNY Mellon.  As a general matter, investment directions were handled in the following manner.  After WellSpan decided how it wanted to invest Plan funds, it would prepare an investment directive in the form of a letter to BNY Mellon, instructing BNY Mellon to complete the investment transaction.  Frequently those letters were prepared by Mr. McCoy.  Because of BNY Mellon's requirements, as embodied in the Master Trust Agreement, WellSpan would then fax the investment directions to the appropriate BNY Mellon CARS team representative.  WellSpan generally also sent a copy of the investment directions to the appropriate BNY Mellon representative by email.  Where wire transfers were required by the investment direction, a CARS team member reviewed and confirmed the instructions with Mr. Harley in a telephone call initiated by BNY Mellon, before executing the investment transaction.

This general practice did not always work flawlessly.  WellSpan did not always provide investment directions containing all of the information required to implement a transfer.  WellSpan employees seem to have had particular difficulty understanding when they needed to provide BNY Mellon wire transfer instructions to implement an investment, and when investments could be implemented through an "internal transfer."[5]  Over the course of the years, BNY Mellon CARS

---

[4] The Court highlights WellSpan's use of the term "invest" in this document when directing the purchase of money market interests.

[5] The evidence at trial showed that the general protocol was that investments in funds whose assets are custodied outside of BNY Mellon required wire transfers; others could be implemented through internal transfer.  "Active" accounts were managed by outside managers, but the assets remained custodied by BNY Mellon.  "Commingled Funds," such as the LSV International Fund, however, contained assets custodied outside of BNY Mellon.  Plaintiffs assert that despite over

team representatives reached out to WellSpan representatives a number of times to seek clarification, or to provide guidance to WellSpan regarding the content of its investment directions.  In particular, on a number of occasions, BNY Mellon CARS team members reached out to WellSpan when WellSpan failed to provide wire transfer instructions needed to fund particular managers, or to confirm investment directions made without wire transfer instructions.

At trial, the Court heard testimony regarding a number of such instances, including the following:

- In January 2008, WellSpan directed BNY Mellon to invest $3 million into LSV International.  However, WellSpan did not provide any wire instructions.  After receiving that WellSpan directive, the BNY Mellon CARS representative told WellSpan it did not need wire instructions because "I already had copies of the 'wire instructions . . . .'"

- In August 2010, WellSpan directed BNY Mellon to comply with a capital call for one fund, named Portfolio Advisors.  However, WellSpan did not include wire instructions.  The BNY Mellon CARS representative subsequently followed up with WellSpan to ask them to provide wire instructions.

- On September 29, 2010, WellSpan requested an investment of $2.5 million to account number WHLF 2001022 (Waddell & Reed).  In a telephone conversation on October 5, 2010, Ms. Bognar, a BNY Mellon CARS team representative, told Mr. McCoy that the investment had been completed because Waddell & Reed was considered an "active manager" for whom wire transfer instructions were not needed.

- On October 26, 2010, WellSpan directed BNY Mellon to invest $5.3 million of the Non-ERISA Fund's assets into LSV International.  The directive did not include wire instructions.  BNY Mellon followed up and asked WellSpan for wire instructions to implement the investment.

- On July 7, 2011, Matt Hoetzlein, a BNY Mellon representative, informed Mr. McCoy that wire transfer instructions were needed to invest assets with two investment managers (Quellos and Private Advisors), but not a third investment manager (BlackRock Fixed).

### E.  WellSpan's 2010 Investment in LSV International

The 2010 investment by WellSpan's Non-ERISA Fund in the LSV International Value

---

a decade each of experience managing the day to day operations of the Plan, Messrs. Harley and McCoy did not comprehend this general practice.

Equity Trust ("LSV International") is worthy of more detailed review. While it is not directly at issue in this case, the way that the parties handled that transaction provides meaningful context for the failed 2013 investment in LSV International at issue in this lawsuit.

WellSpan selected LSV Asset Management ("LSV") as an investment manager in approximately 2003. WellSpan initially hired LSV to manage a domestic equity portfolio and later selected it as an international equity manager as well. On October 24, 2006, the Plan entered into an Adoption Agreement with LSV regarding the Plan's purchase of units in LSV International (the "Adoption Agreement"). BNY Mellon was not a party to the Adoption Agreement. Rather, the Adoption Agreement made it clear that The Northern Trust Company acted as custodial trustee with respect to the Plan's interest in LSV International.

The Adoption Agreement between WellSpan and LSV contained provisions regarding the timing of investments in LSV International. In particular, Section 10 of the Adoption Agreement required WellSpan to notify LSV one week prior to any Plan investment in the LSV International Value Equity Trust. In addition, in a letter dated November 10, 2006, LSV established a procedure for investments in LSV International. According to LSV, contributions could be made only on the first business day of every month. The letter also required that a contribution form be faxed to LSV one week prior to month-end, notifying LSV of a planned investment. The letter attached a contribution form, which included wire transfer instructions for investments, directing funds to The Northern Trust Company.

On September 29, 2010, Mr. McCoy sent investment instructions to BNY Mellon for a number of transactions, including one involving an investment of $5.3 million of Non-ERISA Fund assets in the LSV International Value fund. Mr. McCoy's investment instructions did not include wire transfer instructions.

Approximately a week after he sent the investment directions, on October 5, 2010, Mr. McCoy called Nancy Bognar, a member of the CARS team, to follow up regarding his September 29

instruction.  The call was recorded.  After a friendly chat, Mr. McCoy inquired "what has not gone

out yet" from the September 29 investment directive.  Ms. Bognar explained that "the LSV has not

gone out and the Artisan Partners . . . ."  Ms. Bognar then provided Mr. McCoy a tutorial about the

reasons why the directed investments had not been implemented by the bank in the following

exchange:

> <u>Ms. Bognar</u>:  And the reason being, those are passive accounts.  So we'll need to
> wire those funds to, ah, to the investment managers.  The Waddell and Reeds,
> those are active managers, so all we really had to do was put the money into those
> accounts.
>
> <u>Mr. McCoy</u>:  Okay.  Now, when I gave this directive, should I have said, "please
> transfer/wire the funds as follows"?
>
> <u>Ms. Bognar</u>:  What you want, what you would want to do is, um, we would do
> transfers where necessary and then you would want to provide the wiring
> instructions for the passive managers.  And then we would have wired the funds
> out from there.
>
> <u>Mr. McCoy</u>:  Okay. . . .  I'm not sure if, I, I, thought we would have had
> something on file for the LSV and the Artisan.
>
> <u>Ms. Bognar</u>:  We can't do, I mean to say, we can't do a standing instruction for
> those types of wires.
>
> <u>Mr. McCoy</u>:  Okay.
>
> <u>Ms. Bognar</u>:  Um, if it was, oh, I wanna say, a fee wire or if it was, like, ah, we
> were doing an income, monthly income sweep wire or something like that.  We
> could do a standing instruction for those.  But these types of . . . new funding for
> new investment, we . . . would need a, a letter of instructions for each wire for
> that.

Several points should be highlighted from this exchange.  First, that it was initiated by Mr.

McCoy, following up on the bank's implementation of his prior investment direction in the week

following its delivery.  Second, that the bank explained to Mr. McCoy that new investments in

passive managers required wire transfer instructions, and that his requested investment in LSV

International had not been implemented because he failed to provide wire transfer instructions.

Third, that while the bank could use wire transfer instructions on file for things like payment of

investment management fees and monthly sweeps, they could not use them for new investments. Fourth, that, unlike investments in passive managers, investments in "active" managers like the "Waddells and Reeds" could be implemented through internal transfers without wire transfers. These points are worthy of note because unlike in 2010, for the transaction at issue in 2013, no one from WellSpan followed up with BNY Mellon. More importantly, Mr. McCoy was informed in 2010 what was required to implement a new investment in LSV International—wire transfer instructions—and that a new investment in that fund could not be made in the absence of wire transfer instructions.

During the call with Ms. Bognar, Mr. McCoy heard something else—because WellSpan had not provided wire transfer instructions for the investment in LSV, the funds allocated to that investment were invested in short-term cash equivalents pending further investment directions from WellSpan. Moreover, he was told that those cash equivalents were allocated to the respective managers' accounts within BNY Mellon, rather than a separate cashflow account. The transcript of the conversation between Mr. McCoy and Ms. Bognar on that point reads as follows:

> <u>Mr. McCoy</u>: Now, where is the cash sitting right now, is it still in Integrity?
>
> <u>Ms. Bognar</u>: They're in, no, it those are in, the rebalance was done, so, um, the LSV has the 5.3 and the Artisan has the 9 million.
>
> <u>Mr. McCoy</u>: Okay, so it's actually showing up as being under those managers, but they . . . .
>
> <u>Ms. Bognar</u>: But not invested because the wire, the funds haven't been wired out.
>
> <u>Mr. McCoy</u>: Is it sitting in, like an overnight account at this point?
>
> <u>Ms. Bognar</u>: Let me see. It should be. I think you do have, um, short term vehicles on both, but let me check . . . . Yes, you have a short term vehicle on the LSV . . . .

After Mr. McCoy learned that the funds had not been invested in LSV International as expected, WellSpan decided instead to combine the $5.3 million that had been earmarked for investment in LSV International with $9 million that had been earmarked for investment in Artisan

Partners.  WellSpan directed that the combined total be invested in equity through the Artisan

Partners account for the month of October.  It appears that WellSpan directed the investment of the

$5.3 million otherwise allocated to LSV to Artisan because LSV only accepted contributions at the

beginning of the month, which had passed.  Artisan did not have the same restriction, so WellSpan

was able to correct its mistake, investing all of the funds in an Artisan equity account for the month

of October, rather than leaving the funds in cash equivalents for the entire month.

On October 26, 2010, Mr. McCoy sent BNY Mellon a "funding/contribution notice for

LSV International (WHLF 4001012)" to invest $5.3 million of Master Trust assets with LSV during

the November 2010 investment window.  The October 26, 2010 investment instructions again did

not include wire transfer instructions.  On October 26, 2010, Matt Hoetzlein, a BNY Mellon CARS

representative assigned to WellSpan, called Mr. Harley to confirm the instructions.  During the call,

Mr. Hoetzlein informed Mr. Harley that wire transfer instructions were needed to complete the

investment, and told Mr. Harley that he would call Mr. McCoy to request wire transfer instructions.

On October 26, 2010, Mr. Hoetzlein called Mr. McCoy and requested wire transfer instructions for

the requested investment with LSV.  Mr. McCoy then sent the wire transfer instructions to BNY

Mellon for LSV International via email as Mr. Hoetzlein had requested.  The October 26, 2010

investment instructions were then executed by BNY Mellon, and the investment in LSV

International was completed.

In a number of interactions prior to June 2013, BNY Mellon representatives reached out to

WellSpan for clarification and guidance regarding investment directions.  On several occasions,

BNY Mellon told WellSpan that wire transfer instructions were required to implement investments

requested by WellSpan, and requested that the instructions be provided.  Plaintiffs argue that all of

these helpful interactions gave rise to a "course of performance," as a result of which WellSpan

came to rely on BNY Mellon for feedback regarding the form and substance of insufficient

investment instructions.  The Court credits the testimony of WellSpan officials that they did not in

fact know which investments required wire transfer instructions and which did not.  WellSpan prepared investment directions without an understanding of those or a number of other details regarding the operations of their funds.  Instead, WellSpan typically relied on instructions it had successfully used in the past for particular investment managers and came to expect that BNY Mellon would alert WellSpan if any necessary information was missing from WellSpan's instructions.

At the same time, the interactions prior to June 2013 show that WellSpan officials had more than ample opportunities to learn how the process worked.  Mr. McCoy's conversations with BNY Mellon representatives in September 2010 were particularly informative.  He learned—or, rather, heard, but failed to learn—that investments in LSV International required wire transfer instructions, and that failure to provide them would lead the bank to implement the "rebalancing" by allocating the funds to the respective managers' accounts where they would be swept into a short term vehicle. WellSpan was able to correct that error after a short window in 2010 because a WellSpan representative followed up with the bank regarding the investment directive shortly after it was issued.  Mr. Harley and Mr. McCoy failed to learn these lessons, relying on BNY Mellon representatives to correct their mistakes.  In 2013, when the quality of BNY Mellon's services declined, their failure to learn these lessons came to cost the Plan.

### F.  BNY Mellon CARS Team Transition in 2013

In April 2013, the entire CARS Team assigned to the WellSpan account was replaced.  On April 12, 2013, Ms. Strub emailed Messrs. McCoy and Harley to inform them that their assigned CARS representative, Kate Conner, had accepted a position outside of BNY Mellon, and that in her place, BNY Mellon had assigned Erik Buczynski to be WellSpan's "new day to day contact."  At the time, Mr. Buczynski had no previous involvement with the WellSpan relationship and had never served as a backup representative for the WellSpan account.  He was brand new to the WellSpan relationship.  Both of Mr. Buczynski's newly assigned backup representatives were also new to the account.

Ms. Strub assured her clients that Ms. Conner and Mr. Buczynski had "been working behind the scenes . . . to assure that [Mr. Buczynski] is familiar with [WellSpan's] reporting needs and day to day activities so there will be no interruption in the service that you [WellSpan] receive[s]." Mr. Buczynski was not new to work as a CARS representative; he had been working in that capacity since 2007. He was experienced, and a college graduate who had taught school before joining the bank. But while he had advanced within the CARS team during his years at the bank, he was still an operational member of the CARS team, paid hourly, several levels below senior management in the CARS unit. In April 2013, Mr. Buczynski reported to Scott Mack, who reported to Natalie Mansell. Ms. Mansell reported to Deborah Beck, who reported to Victor Mull, who was the site manager for CARS/Pittsburgh. Mr. Mull was the Senior Manager for all of CARS in Pittsburgh.

Unfortunately, despite Ms. Strub's reassurances, Mr. Buczynski did very little to prepare himself to serve as WellSpan's representative. In fact, all that Mr. Buczynski did to prepare himself was to sit and speak with Ms. Conner over the course of approximately two weeks in early April, 2013. During that short period, he observed her as she processed whatever instructions were sent to her. Mr. Buczynski did not have the opportunity to observe Ms. Conner process any outgoing wires or internal transfers for WellSpan, and he did not independently review any past internal transfers or outgoing wire transfers involving WellSpan. He did not review any WellSpan investment directives processed by any of BNY Mellon's previous CARS representatives who were assigned to the WellSpan account before Ms. Conner. He did not speak with any previous CARS representatives assigned to WellSpan to discuss how they handled WellSpan transactions. Nor did Mr. Buczynski speak with anyone at WellSpan to discuss what processes should be followed for their account or to learn their expectations regarding his services. Further, at trial, Ms. Strub was cross-examined about any efforts undertaken to ensure that Mr. Buczynski was equipped to take over as WellSpan's contact given Ms. Conner's departure. During this line of questioning, Ms. Strub testified— somewhat surprisingly, given a directed trustee's responsibility for ensuring that investment

directives are "made in accordance with the terms of the plan"—that she "did not believe" that Mr. Buczynski or the CARS team had "access to the Master Trust Agreement."

As a result, in July 2013, after years working with other BNY Mellon CARS representatives, WellSpan was left to work with Mr. Buczynski, who was experienced in the industry, but had very little understanding of his client and its expectations.

### G.  The July 2013 Investment Directive

WellSpan made a $29 million contribution to the Plan on July 15, 2013.  The $29 million contribution was made in cash into the Plan's "Cashflow" account.  WellSpan did not want the $29 million to sit in cash in the Cashflow account, however; it wanted to invest that money in equities so that it could potentially earn returns for the benefit of Plan participants.  WellSpan decided to invest $14 million of that contribution in Artisan Partners, an equity fund.  The remaining $15 million, WellSpan decided, should be invested in LSV International.

Mr. McCoy was responsible for preparation of the paperwork to direct BNY Mellon to invest the $29 million contribution.  When he prepared the investment directive for the investment in LSV International, Mr. McCoy went to the electronic folder that contained the most recent instruction directing BNY Mellon to direct funds to LSV from the Plan.  Unfortunately, the template that Mr. McCoy used was one that directed the payment of periodic fees, not an equity investment in LSV International.  As an instruction for the payment of fees, the template that Mr. McCoy selected was for a "repetitive" transfer—one that could be implemented without specific wire transfer instructions, using wire transfer information for LSV on file at the bank.  Mr. McCoy did not remember the tutorial that he had received in 2010 regarding the necessary content of an instruction to direct an equity investment in LSV International.  Mr. McCoy used the template that he found, thinking that the appropriate template for investment directions was one for the Plan, not the Non-ERISA Fund, but it was the Non-ERISA Fund that had completed the most recent equity investment in LSV International.  As discussed above, the most recent equity investment in LSV

International on behalf of the Non-ERISA Fund was, ultimately, accompanied by wire transfer instructions, and a notice and contribution form directed to LSV itself to satisfy the requirement that the manager be provided advance notice of proposed investments in the fund—all features lacking in the template instruction upon which Mr. McCoy relied in preparing the July 2013 directive.

On July 23, 2013 at 5:19 p.m., Mr. McCoy sent an email to his colleagues at WellSpan, copying an account at BNY Mellon to which Mr. Buczynski had access.  It read:

> Attached are the word files for the funding of Artisan and LSV Intl from the Pension Plan.  These are ready to go, subject to Mike's approval. . . .  Can someone also notify the manager of the incoming funds via email?  Just to confirm receipt and that the funds are invested.

Attached to the email were two Word files.  The first was a draft letter to Mr. Buczynski.  It read, in pertinent part:

> Hi Erik:  Please consider this authorization to fund LSV International with the excess funds contributed in the Pension Plan.  The funds can be transferred as follows:

| Pension Plan Acct # | Acct name | |
|---|---|---|
| WSLF1001002 | Pension Cash Flow | ($36,482.45) |
| WSLF4001012 | LSV International | 36,482.45 |

> Total Addition/ (Reduction)
>
> If you have any questions or require additional information contact me . . . or Rick Harley . . . .
>
> Sincerely,
>
> Joey L. McCoy
>
> Controller/Mgr of Treasury

The second attachment was also a draft letter to Mr. Buczynski from Mr. McCoy regarding the Plan's proposed investment in Artisan Partners.  This draft letter began, "As discussed, please consider this authorization to transfer the cash from the Pension Cashflow (WSLF1001002) to Artisan Partners (WSLF4001002) for purposes of investing the funds."  The letter then provided

specific information, directing the bank to transfer $14 million from the Cashflow account to the Artisan Partners account.  Unlike the draft instruction regarding the investment in LSV International, this draft letter then included wire transfer instructions preceded by the following text: "The instructions for Artisan are as follows:"  The last sentence of the draft letter before Mr. McCoy's signature block read:  "Please consider this authorization to initiate the funding to the above managers on July 24, 2013.  If you have any questions or require additional information please contact me . . . or Rick Harley . . . ."

As with the instruction regarding LSV International, Mr. McCoy relied upon a prior directive for an investment with Artisan Partners when he prepared the template for that instruction.  As Mr. McCoy testified at trial, his "practice . . . was just to pull a form that had been previously used." While Plaintiffs' position in this litigation relies heavily on the fact that this second letter, when issued, referenced the above "managers" in the plural, WellSpan officials did not provide direct evidence that they intended the reference in the last sentence to fund the above "managers" in the plural to refer both to LSV International and to Artisan Partners.  Rather, Mr. McCoy prepared each of the two investment directions from templates.  He did not instruct his colleagues to fax the Artisan Partners letter after the letter to LSV International, so that the reference to the "above managers" would necessarily be read to include LSV International.  The Court concludes that the reference to "managers" in the plural in the letter regarding the investment in Artisan Partners was not an intentional reference by Mr. McCoy to both LSV International and Artisan.

Mr. McCoy also prepared a fax cover sheet to fax the instructions to BNY Mellon when they were finalized.  That fax cover sheet was also included in Mr. McCoy's email.  Mr. Buczynski saw Mr. McCoy's July 23, 2013 email and its attachments, but took no action with respect to it.  It was not specifically directed to him, and he did not understand that it required action by him.  On July 24, Mr. McCoy left for vacation, leaving it to his colleagues to implement the investment directions after their final approval.

At 4:38 p.m. on July 24, 2013, Mr. Harley emailed Mr. Buczynski the instructions that led to this lawsuit.  The cover email read simply:  "Erik, please process as instructed."  The email forwarded a scanned fax from Mr. McCoy dated July 24, 2013, and two attached letters.  Those documents were faxed by WellSpan to BNY Mellon on July 25, 2013, but WellSpan did not change the date on the fax cover sheet from July 24 to July 25.

The fax cover sheet from Mr. McCoy to Mr. Buczynski read simply "Hi Erik, Attached are instructions to invest the excess funds in the pension plan.  Please call Rick if you have any questions or need additional information."  The fax cover sheet transmitted two separate letters, both dated July 23, 2013 and signed by Mr. McCoy.  The first was a letter regarding the allocation to LSV International.  The text of the executed letter was the same as that of the draft included in the July 23 email, but each of the references to $36,482.45 in the draft were replaced by $15 million.[6] The letter, therefore, instructed the transfer of $15 million from the Plan's Cashflow Account to the LSV International account.  No wire transfer instructions were provided to direct the payment of funds from the LSV International Account to the custodian for LSV International.

The second letter attached to the fax was identical to the draft forwarded in the July 23 email by Mr. McCoy, but was executed by him.  It directed the transfer of funds from the Plan's Cashflow account to the Plan's Artisan Partners account.  It also provided further wire transfer instructions for funds to be transferred from the Artisan Partners account to State Street Bank and Trust Company for credit to the Artisan International Fund.

These were the only documents sent by WellSpan to BNY Mellon, or anyone else, in connection with the proposed investment in LSV International.  Notably, WellSpan did not notify LSV of its intent to invest in LSV International, despite the requirement in its agreement with LSV to notify LSV one week prior to any Plan investment in LSV International.  Nor did WellSpan send

---

[6] The inclusion of the low dollar amount in the template selected by Mr. McCoy, and erroneously attached to his email, signals that the template used was one for fees, rather than an equity investment.

a contribution form to LSV, notifying LSV of a planned investment, despite LSV's established written procedures for investments in LSV International.

### H.  The July 25, 2013 Callback

BNY Mellon procedures require that a CARS representative call the client to verify a direction whenever the request is to wire more than $50,000 outside of the custody of BNY Mellon. So, after he received the fax from WellSpan on July 25, Mr. Buczynski called Mr. Harley on a recorded line to confirm the direction regarding Artisan Partners, which on its face required that the bank wire funds to a third party.  That Mr. Buczynski understood the purpose of the call to be confirmation of the wire transfer to Artisan Partners is clear from the transcript of the recorded conversation.

> Mr. Buczynski: . . . .  Now we received your fax here, um, concerning, um, well, it's a 4-page fax.  Page 3 is moving $14,000,000 from the Cashflow to the Artisan Partners and then we're gonna wire out from there.
>
> Mr. Harley:  Um hum.
>
> Mr. Buczynski:  Okay.  So, ah, if I could do a call-back with you.
>
> Mr. Harley:  Sure thing.

Mr. Buczynski then conducted his callback with respect to the wire transfer to Artisan Partners.  He walked through each of the steps that would be implemented by the bank—first a transfer of funds from the Cashflow account to the Artisan Partners account, and from there a wire transfer to the routing number identified in WellSpan's letter.[7]  Mr. Harley confirmed those instructions:  "Got it," he said.

The next fourteen seconds of the recorded call have been scrutinized by the parties, at least one expert analyst, and the Court.  After Mr. Harley confirmed the wire transfer to Artisan Partners, Mr. Buczynski continued on to say:

---

[7] Mr. Buczynski:  "But once again $14 million dollars is gonna be moved down from the Cashflow account to the Artisan Partners prior to the wire being sent out and then, um, we're gonna be sending, ah, wire to the following ABA number . . . ."

> Mr. Buczynski: . . . .   Okay, we'll go ahead and, ah, get this wire, um going here
> this morning and, um, then like I said, there's also, looks like an internal transfer,
> um, it's gonna be moved to the LSV International [stock] [and stuff], $15 million.
>
> Mr. Harley:  15, right.

As indicated by the brackets in the quotation above, the parties dispute what Mr. Buczynski said at the end of his sentence.  Plaintiffs contend that he said "it's gonna be moved to the LSV International stock," while Defendant contends that instead of "stock," Mr. Buczynski said "and stuff."  Plaintiffs claim that Mr. Buczynski affirmatively misrepresented what would be done with the funds by telling Mr. Harley that they would be moved into "stock."  The Court does not conclude that Mr. Buczynski affirmatively misled Plaintiffs or that they relied on a statement by him that the funds would be moved to "stock."

The Court does not credit Mr. Harley's testimony that he heard Mr. Buczynski say "stock" during the call.  The Court has listened to an enhanced version of the recording numerous times, as have the parties.  Mr. Buczynski's statement was indistinct, even when examined with close attention.  Even under controlled circumstances, the Court does not hear Mr. Buczynski say the word "stock" immediately after "LSV International" as Plaintiffs propose.  The Court does not believe that Mr. Harley heard Mr. Buczynski clearly say that word in his single, less focused, live audit of the statement.  In addition, Mr. Buczynski knew that a wire transfer was necessary in order to implement an equity investment in LSV International.  In his callback for Artisan Partners, Mr. Buczynski described two steps—an internal transfer of funds from the Cashflow account to the Artisan Partners account and then a wire transfer.  In connection with the LSV International direction, Mr. Buczynski described just one step, "an internal transfer," which he understood to be an internal transfer from the Cashflow account to the LSV International account.  Mr. Buczynski did not think that he was going to be investing the funds in stock at that time, and had no reason to say so.

Plaintiffs scoff at Mr. Buczynski's testimony that he said "and stuff" instead of "stock"—

pointing out that "and stuff" is not the language of high finance.  It is not.  But the Court credits Mr. Buczynski's testimony on this point—"and stuff" is consistent with the casual language used by him in several recorded callbacks presented to the Court.  The Court concludes that Mr. Harley did not hear Mr. Buczynski say "stock," and that WellSpan did not rely on such a statement in the months between July 25 and discovery that the funds had not been invested in LSV International equity.

## I.   Execution of the July 25 Investment Directions

Mr. Buczynski understood WellSpan's July 25, 2013 fax to contain two separate investment directions, each contained in a separate signed letter:  the Artisan Partners letter directed first an internal transfer of funds to the Artisan Partners account, and then a wire transfer; the LSV letter directed a single internal transfer from the Cashflow account to the LSV International account.  He understood this to be, in his words, a "very clear-cut, precise directive."  It is what he described in his callback with Mr. Harley.  It is also consistent with the Master Trust Agreement, which required that investment directions be made in writing and signed by an authorized person.  Here, WellSpan delivered two letters, each executed separately.  Mr. Buczynski did not view the fax cover sheet as itself constituting an investment directive because, among other things, it was not signed.

After the callback with Mr. Harley, Mr. Buczynski did what he understood the investment directions to require:  he transferred $15 million from the Cashflow account (WSLF 1001002) to the LSV International account (WSLF 40010012).  He did not wire the money from there because he had not received wire transfer instructions to do so.  Shortly after he implemented the internal transfer, the cash was automatically invested in a money market fund pursuant to WellSpan's standing "sweep" instructions.  The money market interests remained credited to the LSV International account.

At the time that he implemented the two investment directives, Mr. Buczynski knew that WellSpan's ultimate desired outcome was to invest $15 million in the equity of LSV International.

He ascertained that fact from his review of the July 23 email and the text of the entire fax that was sent to him, including the fax cover sheet.  Moreover, Mr. Buczynski knew that in order to implement an investment in the LSV International equity fund, a wire transfer was required from BNY Mellon to the custody bank for LSV International.  However, after speaking with Mr. Harley, he took no actions to help WellSpan achieve the goal that he knew they wanted to achieve.  More specifically, Mr. Buczynski did not take steps to "remind [him]self that [he] should expect to get a second . . . directive," nor did he call Mr. McCoy or Mr. Harley to request wire instructions, because in his view he "did as [he] was directed."  Mr. Buczynski believed that he should wait for further instructions from WellSpan to implement an external transfer.  Unlike some of this predecessors on the CARS team, Mr. Buczynski did not view it to be his responsibility to take further steps to help the Plan achieve its ultimate goal of placing funds externally with LSV.  That, in Mr. Buczynski's view, was not his job.

At trial, Mr. Buczynski explained his decision not to reach out to WellSpan for further directions.  He described a number of possible reasons why WellSpan would intentionally delay its investment in the equity of LSV International, and instead leave the money invested in a low-yielding money market fund—such as a desire to hold the money in cash until the next investment window for the manager.  The Court does not fully credit Mr. Buczynski's testimony that he considered all of these alternatives at the time, or that he thought consciously at the time that WellSpan intended to delay the investment in LSV.  However, Mr. Buczynski's timely response to a later, October 25, 2013 email from Ms. Strub asking why he did not reach out to WellSpan for wire instructions lends credence to the notion that Mr. Buczynski was cognizant of at least the possibility that WellSpan did not provide wire instructions because investments in LSV International could only be made on the first of the month.  WellSpan's failure to provide wire transfer instructions did not raise a red flag in Mr. Buczynski's mind that wire transfer instructions were necessarily missing from the instruction as opposed to not being included.  Ultimately, Mr. Buczynski did the minimum

required—implementing the instructions stated in the direction—because he did not think that it was his job to do more.  He did not believe that it was his obligation to reach out to the named fiduciary to counsel them to provide alternative instructions that might better implement their intent.

Two experts testified at trial regarding the proper interpretation of WellSpan's investment directions to BNY Mellon.  BNY Mellon called Mr. Michael Costa, a fiduciary services consultant, and former executive at Citibank and Bankers Trust.  Mr. Costa testified that Mr. Buczynski properly understood WellSpan's fax to contain two separate investment directions—one in each signed letter.  Mr. Costa viewed the LSV letter "as a genuine instruction to transfer $15 million from Account Number WSLF 1001002 (Pension Cashflow) to Account Number 4001012 (LSV International)" and testified that the "instruction does not direct that the $15 million be wired outside of Bank of New York Mellon . . . ."  Mr. Costa further opined that BNY Mellon's "handling of the instruction was proper and consistent with the usual and customary practices of directed trustees."  In response to a question from the Court about how a "prudent custodian must act in the event that they receive an instruction that is ambiguous or confusing or incomplete," Mr. Costa responded that "if indeed they thought that the instructions were confusing or a little bit misleading or not exactly filled out properly, then, yes, they should follow up on it."  However, Mr. Costa did not testify that this particular instruction was "ambiguous or confusing or incomplete."  Rather, he construed the directive at issue "as a genuine instruction to transfer $15 million from Account Number WSLF 1001002 (Pension Cashflow) to Account Number 3001012 (LSV International)."

WellSpan called Ms. Connors, its client relationship contact at NEPC to testify on the same topic.  Ms. Connors' view, in essence, was that BNY Mellon should have construed the entirety of the July 24 fax as an investment directive, and interpreted it to implement WellSpan's intent.  Ms. Connors opined that a custodian should "accept all the information that is provided" rather than "look at just bits and pieces of instructions."  Ms. Connors further testified that, in her experience,

"custodians [have] in fact reviewed the entire document that is provided to them."  Ms. Connors

looked to a number of specific phrases to conclude that the fax directed an investment in the equity

of LSV International, not an internal transfer to the LSV International account.  For example,

according to Ms. Connors, the phrase "to fund" as used in the July 25 fax meant "funding a

manager" or "invest[ing] the money with the manager."  Ms. Connors also opined that the language

in the Artisan Partners letter authorizing BNY Mellon to "fund the above managers" should not be

read as an instruction to hold money in cash, but rather as an instruction to invest in equity.  She

concluded that "WellSpan's instructions were clear that WellSpan wanted BNY Mellon to invest the

$15 million with the manager of the LSV International . . . for investment."[8]  With respect to Mr.

Buczynski's handling of the July 2013 investment directive, Ms. Connors had opined in her direct

testimony affidavit that Mr. Buczynski "lacked sufficient training and experience."  At trial, however,

she testified that she was unaware that by the time he started working on the WellSpan account, he

had approximately 15 years' experience processing investment directives.  Ms. Connors also testified

that she had not reviewed the Master Trust Agreement between WellSpan and BNY Mellon until

after this case was filed.

The Court credits the testimony of Mr. Costa over that of Ms. Connors with respect to

issues regarding the proper construction and interpretation of investment directives by directed

trustees, including those at issue here.  Mr. Costa has many years of direct experience managing

operations of directed trustees.  He has held senior roles in the field since at least 1971.  Ms.

Connors is a seasoned investment professional, who has worked with investment directions on

behalf of investors.  The Court believes that she provided frank, truthful testimony at trial.

However, Ms. Connors has never worked within a custodial bank or been responsible for the

---

[8] Ms. Connors' ultimate conclusion begs the question, because the issue in this case is not what WellSpan wanted BNY Mellon to do, but what WellSpan effectively directed BNY Mellon to do.  Mr. Buczynski understood from the fax that WellSpan wanted to invest in LSV International equity eventually; he did not believe that the instructions that they had provided were sufficient to do so.

implementation of investment directives.  Her experience with, and knowledge of, the relevant provisions of ERISA and the documents governing directed trust arrangements such as the Master Trust Agreement here are limited.  Her principal area of expertise is in investment selection and allocation, not in investment directives and the implementation of those directives.  As a result, the Court finds the testimony of Mr. Costa more persuasive on those issues.

### J.   Discovery of the Failed Instruction and its Aftermath

As noted above, on July 23, 2013, Mr. McCoy emailed his colleagues to ask "Can someone also notify the manager of the incoming funds via email?  Just to confirm receipt and that the funds are invested."  Mr. McCoy testified at trial that this request was "directed to his coworkers" and was not directed to BNY Mellon.  The next day, Mr. McCoy left for vacation.  Despite Mr. McCoy's request, no one from WellSpan notified the manager; nor did anyone from WellSpan follow up to confirm that the funds had arrived at LSV.  That they had not, and were instead invested in a money market fund, would not be discovered until October.

Over the course of the intervening months, BNY Mellon emailed WellSpan monthly "Performance/Analytics" reports regarding the investment performance of Plan assets invested with various investment managers.  Each of those reports listed the relevant account name and account number, and the market value of the assets credited to the account.  The reports then provided data for a benchmark index, and compared the return within the relevant account to that of the index. For example, the report for the end of July 2013 showed that the market value of the assets contained in the LSV International Value account was $38,395,879.38.  The report showed that the investments in the LSV International Value account had increased in value by 6.48% in the month, which compared favorably to the increase in the benchmark MCSIC EAFE-Value Index, which rose only 5.86% during that month.  When WellSpan officials reviewed that emailed report, it was not apparent to them that the $15 million that they wanted to invest in the equity of LSV International was instead invested in a low-yielding money market fund.  The monthly report did not distinguish

between equity and money market investments credited to the LSV International account—instead, it reported the aggregate market value of all assets credited to the account.

Similarly, the performance report for the month of August stated the market value of the Plan's investments in the LSV International account.  At month end, the Plan's investments in that account had an aggregate market value of $38,212,327.66, reporting a 0.48% loss, compared with a 1.31% loss for the benchmark index.  And for September, the report showed that the Plan's investments in the LSV International account had an aggregate market value of $39,914,661.93, a 7.12% increase in value for the month, compared with a 7.87% gain for the benchmark index.

From their review of the monthly reports, WellSpan officials believed that the full amount of the $15 million had been invested in the equity of LSV International.  They did not appreciate that the monthly reports showed the aggregate market value of all assets credited to the LSV International account, rather than the value of their equity investment in the LSV International fund.  WellSpan officials did not understand that approximately $15 million of the amount shown in the monthly performance report to be credited to the LSV International account was held in a money market vehicle.  That WellSpan officials did not deduce that fact from the face of these reports does not make the reports affirmatively misleading, however.  The summary statements provided information regarding the market value of the assets invested by "Account Name," not type of investment.

In addition to the monthly "Performance/Analytics" reports emailed to WellSpan officials, BNY Mellon also made available to WellSpan monthly statements of "net assets available for benefits" through "Workbench," a computer platform.  Those statements included detailed information regarding the specific investments held on behalf of the Plan.  The monthly statements for the end of July, August, and September all showed approximately $15 million in money market interests credited to the LSV International account.  The statement for July 31, 2013 reported $15

million in "FED US TREAS (ONLY) CASH RESERVE 125" credited to "LSV INTL VALUE."[9]
And the August 31, 2013 statement reported $15,000,014.07 held in the same way.[10]  While this
information was available to WellSpan officials, they did not review it, and, therefore, no one from
WellSpan noted the accumulation of cash equivalents credited to the LSV International account.

NEPC performed a quarterly reconciliation process for the Plan.  To do so, NEPC
compared the price data provided by BNY Mellon for each of the Plan's investments with the
investment manager's performance calculations.  If the performance numbers did not match, NEPC
worked to reconcile the differences between the data provided by the investment manager and BNY
Mellon.

During its October 2013 review, NEPC was unable to reconcile the data provided by BNY
Mellon for the Plan's investments in the LSV International account with the data provided by LSV.
So it was that NEPC discovered that LSV International had not received the Plan's intended $15
million investment.  NEPC promptly notified WellSpan regarding its findings.

On October 25, 2013, Mr. McCoy emailed the BNY Mellon team, copying Mr. Harley.  Mr.
McCoy wrote:  "Can you please review the attached transfer and let me know if the funding to the
manager was completed?  It appears that the $15MM is still in a cash position and we are having
problem reconciling performance."

Mr. Buczynski replied to Mr. McCoy by email later that day, copying Mr. Harley, Ms. Strub,
and Mr. Mack.  Attaching the July 25 investment directives, Mr. Buczynski wrote:  "Please see the

---

[9] A significant amount of cash equivalents was held by the Plan at the end of July 2013.  In addition to the $15,000,000 credited to the LSV International account and $2,235,840.78 credited to the Cashflow account, the Plan held in cash equivalents $579,937.02 credited to the "LSV ASSET MGMT" account; $606,852.06 credited to "INTEGRITY ASSET MGT;" and $1,663,505.15 in the "WADDELL & REED" account—over $20 million dollars held in cash equivalents. At trial, plaintiffs' counsel argued that plaintiffs expected that cash equivalents would be credited only to the Cashflow account.  The detailed position statements show that cash equivalents were held in several accounts in addition to the Cashflow account and the LSV International account.

[10] For this month too, in addition to $3,610,992.34 held in cash equivalents in the Cashflow account, the Plan held $746,172.57 in the "INTEGRITY ASSET MGMT" account, $1,609,465.44 in the "WADDELL & REED" account, and $634,332.81 in the "LSV ASSET MGT" account.

attached PDF file that we received on 7/25.  We never received instructions to wire out the money to LSV."  Ten minutes later, Mr. McCoy responded:  "I pulled the previous letters and what was sent was consistent with prior funding requests to get the funds moving so I'm a little confused.  This was right before I left for vacation and I don't recall any notifications back to us that details were not sufficient to move the funds.  Did anyone reach out to anyone on our side to clarify?"  Mr. Buczynski replied only that "[p]er the directive we received for the Artisan, we completed as instructed.  The LSV directive should have directed us in the same manner."  To which Mr. McCoy responded "So by default, BNY will just ignore it?"  Mr. Buczynski replied, saying that "We completed the fax directed."  He also suggested a discussion when Ms. Strub, the account representative, was back in the office.

Ms. Strub may have been away from the office, but she was monitoring the email exchanges between her clients at WellSpan, and the BNY CARS team.  Just fifteen minutes after Mr. McCoy asked if the default was to just ignore an instruction, Ms. Strub emailed her internal team at BNY Mellon, Mr. Buczynski and Mr. Mack, asking:  "Why wouldn't we call the client to inquire on why there was no wire instructions or why they were sending the instruction?  To Joe's [McCoy] point. We just ignored it?"  Mr. Buczynski replied that "We didn't just ignore it, we did as we were directed.  Certain 'commingled funds' have trading windows (ex. funds traded on the 1st of the month)."

The issue escalated within BNY Mellon.  Ms. Strub, WellSpan's client relationship contact, fulfilled her role, advocating within the bank in support of WellSpan's position.  Ms. Strub exchanged a series of emails with Ms. Mansell, Mr. Buczynski's supervisor, on October 29, 2013.  In those emails, she raised the arguments presented by WellSpan—principally, that the investment directives were consistent with those used in the past for LSV International, that the instructions referred to funding the "above managers," and that BNY Mellon failed to follow up regarding the instructions.

In one email sent that day to Ms. Mansell, Ms. Strub commented that "Honestly, I see their [WellSpan's] point, even more reason that Eric should have inquired either via email or phone on why the wiring instructions were missing from the investment direction." Ms. Mansell responded plainly: "Disagree, why would Erik have questioned it, he saw it as a transfer, why would he be looking for wiring instructions?" Ms. Strub responded "Both the cover page and the LSV directive state that this transfer is intended to fund and invest excess funds, furthermore the last page states 'please consider this authorization to fund the above managers.'" Just nine minutes later, Ms. Beck, Ms. Mansell's supervisor, responded, disagreeing roundly. She wrote:

> We require specific instructions from clients and clearly these weren't included. A second instruction with wire instructions being sent on the same day would be the greatest indicator to me that no other activity was expected. It is not the job of this team to decipher directions and that is what they expected. An example from 2010 is silly.[11] Also if they don't notice the cash being invested in their sweep vehicle rather than a fund for 3 months, that is a problem on their end, not ours.

Ms. Strub was dispirited by her colleagues' reactions. She forwarded Ms. Beck's email to a friend, commenting: "I am losing, and I may not have a case but I still feel some responsibility is theirs [the CARS team's]."[12] Over the same period, Ms. Strub was working diligently to shore up the relationship with WellSpan. On October 28, 2013, she forwarded a set of template instruction forms to WellSpan, noting that she was "hopeful that these forms will eliminate confusion going forward as well as simplify the process from your end." These were the first form instruction documents provided by BNY Mellon to WellSpan. In her October 28 email, Ms. Strub also noted that the $15 million remained invested in cash and asked for instructions to wire it for investment.

---

[11] Ms. Mansell was referring to the Non-ERISA Fund's investment in LSV International in 2010. In October 2013, WellSpan took the position that the investment had been implemented without wire transfer instructions. As detailed above, however, Mr. McCoy's recorded conversation with BNY Mellon regarding the investment direction show that BNY Mellon told Mr. McCoy that wire transfer instructions were needed to implement the investment, and in response WellSpan did provide them.

[12] Ms. Strub testified at trial that, in spite of the statements made in her emails, she had changed her position, and now supported BNY Mellon's conclusion regarding the investment direction. The Court credits her trial testimony. Ms. Strub was responsible for the client relationship; she was not an expert in directed trusts or custody issues. As a client services representative, she advocated for her customer. The Court accepts that she became more educated regarding the principles governing the construction of investment directions after her email exchanges in October 2013.

The bank continued its internal review of its response to WellSpan's investment, sparking an extended email exchange between Ms. Mansell, Ms. Beck, Mr. Mull, and Mr. Schavolt.  Over the course of that exchange, the bank's position solidified:  the CARS team's response to the direction had been correct.  On November 4, 2013, Mr. Mull summarized his view of the bank's position in a phrase that captures the essence of this case:  "Best Practice would be to follow up but that does not mean we must follow up."

WellSpan made arrangements for BNY Mellon to invest the $15 million at issue in the LSV International Value Equity Trust on the next available investment date, November 1, 2013.  The funds were invested on that date.  The Plan later redeemed all of its shares of the LSV International Value Equity Trust as of November 30, 2013 when, at NEPC's suggestion, the Plan reallocated the assets to a fund called the LSV International ACWI fund.  By then, the failed investment in LSV International had cost the Plan a significant amount of money.  The Court heard expert testimony, which it credits, that if the investment with LSV had been made on August 1, 2013, after accounting for fee differences, the contribution would have been worth $1,721,185.21 more than the actual ending investment value as of October 31, 2013.[13]

WellSpan and BNY Mellon continued to work together for a period of time, and tried to work out a resolution to the disputed issue.  WellSpan tapped Ms. Connors to lead its efforts to negotiate a resolution with BNY Mellon.  But the efforts foundered.  Ultimately, WellSpan fired BNY Mellon as a result, in part, of its handling of the investment directive at issue in this case.  And WellSpan brought this action.

---

[13] The Court does not reach the issue of damages in this case.  However, it is not certain that this would be the appropriate damages calculation if the Court had found liability.  As noted, in the 2010 investment by the Non-ERISA Fund in LSV International, which presented nearly the same fact pattern, the investment did not remain in cash. Instead, when BNY Mellon told WellSpan that the funds had not been invested in LSV International by the investment deadline, WellSpan temporarily invested the funds in Artisan Partners.  It did not hold them in cash until the LSV International investment window reopened.

## II.   CONCLUSIONS OF LAW

Plaintiffs have brought a single cause of action for breach of fiduciary duty in violation of 29

U.S.C. § 1104(a)(1)(B).  Plaintiffs argue that BNY Mellon violated this provision "in numerous

respects when it failed to use the care, skill, prudence and diligence under the prevailing

circumstances that a prudent person acting in a like capacity and familiar with such matters would

use in conducting the duties of a custodian for a pension plan in how it handled the Plan's July 2013

Investment Instructions."  Plaintiffs' Proposed Findings of Fact and Conclusions of Law (Dkt. No.

79), ¶ 231.  The Court first considers the legal principles applicable to the relationship between

WellSpan as named fiduciary and BNY Mellon as directed trustee, and then addresses Plaintiffs'

arguments that BNY Mellon breached its fiduciary duties under ERISA.

### A.   BNY Mellon Acted as a "Directed Trustee"

It is undisputed that BNY Mellon acted as "directed trustee," the significance of which will

be discussed in more detail below.  At trial, Mr. McCoy testified in no uncertain terms that

investment decisions rested solely with WellSpan, and that WellSpan did not expect BNY Mellon to

question the wisdom of any of WellSpan's investment decisions.  Plaintiffs' counsel also agreed

during post-trial oral argument that BNY Mellon was acting as a directed trustee with respect to the

matters at issue in this case.  The Court agrees with this concession.  The conclusion that BNY

Mellon acted as a directed trustee under ERISA is supported by the evidence presented at trial,

including the testimony of WellSpan and BNY Mellon representatives and the terms of the Master

Trust Agreement itself.

### B.   The Duties of a Directed Trustee are Extremely Narrow

The fiduciary duties of a directed trustee are limited by statute.  ERISA provides that a

trustee "shall have exclusive authority and discretion to manage and control the assets of the plan,

except to the extent that . . . the plan expressly provides that the trustee or trustees are subject to the

direction of a named fiduciary who is not a trustee, in which case the trustees shall be subject to

proper directions of such fiduciary which are made in accordance with the terms of the plan and which are not contrary to this chapter." 29 U.S.C. § 1103(a).  A trustee who acts subject to the directions of a named fiduciary, as described in the statute, is what the Court refers to here as a "directed trustee."

"[T]he fiduciary obligations of directed trustees are circumscribed by the parameters of their duties pursuant to" 29 U.S.C. § 1103(a).  *In re Worldcom, Inc. ERISA Litig.*, 354 F. Supp. 2d 423, 444 (S.D.N.Y. 2005).  A directed trustee's "liability is limited to instances in which it fails to follow such proper directions [of a named fiduciary] or it complies with directions that are improper, or contrary to the Plan or ERISA."  *In re Lehman Bros. Securities and ERISA Litig.*, No. 09-md-2017 (LAK), 2012 WL 6021097, at *2 (S.D.N.Y. Dec. 4, 2012) (quoting *DeFelice v. U.S. Airways, Inc.*, 397 F. Supp. 2d 735, 746 (E.D. Va. 2005)).  Thus, the fiduciary duties of a directed trustee are "extremely narrow." *Id.* (quoting *F.W. Webb Co. v. State Street Bank and Trust Co.*, No. 09-cv-1241 (RJH), 2010 WL 3219284, at *13 (S.D.N.Y. Aug. 12, 2010)).  The duties of a directed trustee "are . . . significantly narrower than the duties generally ascribed to a discretionary trustee under common law trust principles." *Id.* (citation omitted).

"A directed trustee must discharge its own duties in conformity with the prudent man standard of care,"[14] *In re Worldcom*, 354 F. Supp. 2d at 445, but a directed trustee's "duty of

---

[14] The "prudent man" standard applicable to ERISA fiduciaries provides, in relevant part:

> (1)  . . . a fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and—
> (A) for the exclusive purpose of:
> (i) providing benefits to participants and their beneficiaries . . .
> (B) with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims;
> (C) by diversifying the investments of the plan so as to minimize the risk of large losses, unless under the circumstances it is clearly prudent not to do so; and
> (D) in accordance with the documents and instruments governing the plan insofar as such documents and instruments are consistent with the provisions of this subchapter and subchapter III of this chapter.

29 U.S.C. § 1104(a).

prudence" is "quite constricted," *F.W. Webb Co.*, 2010 WL 3219284, at *13. "[T]ypically, a directed trustee is only charged with knowledge that an investment instruction is imprudent where the trustee possesses non-public information that a company's financial statements are false or where it possesses public information showing with near certainty that a company is on the brink of collapse." *Id.* The Department of Labor, in Field Assistance Bulletin 2004-3 (Dec. 17, 2004), has similarly articulated an exceptionally narrow concept of "prudence" in the context of a directed trustee's duties, and this guidance has been characterized as "persuasive authority to which this Court should give at least substantial weight in articulating the standard that should be applied to a directed trustee's responsibilities." *In re Worldcom*, 354 F. Supp. 2d at 446; *see also In re Lehman Bros.*, 2012 WL 6021097, at *2 (quoting the Bulletin in articulating the duties of a directed trustee under ERISA). With respect to "determining the prudence of a particular transaction," the Department of Labor has concluded that directed trustees generally need not question the prudence of proposed investments. Rather, absent a directed trustee's possession of material non-public information regarding a security, "given its limited fiduciary duties as determined by statute, [a directed trustee] will rarely have an obligation under ERISA to question the prudence of a direction to purchase publicly traded securities at the market price solely on the basis of publicly available information." DOL Field Assistance Bulletin 2004-3 (Dec. 17, 2004). Several "considerations counsel in favor of this view," including the fact that "ERISA section 404 requires the instructing fiduciary to adhere to a stringent standard of care." *Id.*

Courts therefore consistently hold that a directed trustee has no obligation to evaluate the financial merits of a named fiduciary's investment directive, except in extremely limited circumstances not present here. *See, e.g., In re Lehman Bros.*, 2012 WL 6021097, at *2 ("[A directed trustee] has no duty to 'duplicate or second-guess the work of the plan fiduciaries that have discretionary authority over the management of plan assets.'") (quoting DOL Field Assistance Bulletin 2004-3); *In re Worldcom*, 354 F. Supp. 2d at 449 ("The choice of investment options remains

in the hands of the named investment fiduciary.  A directed trustee has no duty to investigate the wisdom of those choices or any obligation to render advice regarding the choices."); *In re RCN Litig.*, No. 04-5068 (SRC), 2006 WL 1273834, at *4 (D.N.J. Mar. 22, 2006) ("Regarding the direction of investment of Plan assets in specific securities, as long as the directed trustee is required, by the Plan's terms, to follow the directions of a named fiduciary, their investment decisions are essentially 'immune from judicial inquiry.'") (quoting *Moench v. Robertson*, 62 F.3d 553, 571 (3d Cir. 1995)); *DiFelice v. U.S. Airways, Inc.*, 397 F. Supp. 2d 735, 751 (E.D. Va. 2005) ("A directed trustee under § 403(a) has no duty to assess the merits of a named fiduciary's direction and to reject that direction, if, in the exercise of the directed trustee's independent judgment, the direction is imprudent.").

During post-trial closing argument, Plaintiffs took the position that directed trustees retain fiduciary duties that go beyond the scope of responsibilities delineated in 29 U.S.C. § 1103(a), arguing that the "only thing that ERISA['s] [directed trustee provisions] remove[] from BNY Mellon's scope of responsibilities" is a "duty to question the prudence of the decision to invest in LSV International."  The Court cannot accept that argument.  The argument is contradicted by the plain text of the statute, and does not find support in persuasive legal authority.  A directed trustee's "liability is limited to instances in which it fails to follow such proper directions [of a named fiduciary] or it complies with directions that are improper, or contrary to the Plan or ERISA."  *In re Lehman Bros.*, 2012 WL 6021097, at *2 (citation omitted).

### C.  BNY Mellon Did Not Breach Its Duties as a Directed Trustee

Having established that BNY Mellon acted as a directed trustee with respect to the investment directive at issue, and having outlined the fiduciary duties of a directed trustee under ERISA, the question for the Court is whether BNY Mellon breached those duties by handling the July 2013 investment directive from WellSpan in the manner that it did.  The Court recognizes that BNY Mellon's level of customer service to WellSpan declined after Ms. Conner's departure from the bank.  However, for the reasons described below, the bank's conduct did not fall below the statutory

floor established by ERISA.

## 1. BNY Mellon Did Not Execute a Direction Contrary to ERISA or Not in Accordance with the Plan

A directed trustee breaches its fiduciary duties by following a direction from a named fiduciary that is "contrary to" ERISA or not "in accordance with the terms of the plan."  *See* 29 U.S.C. § 1103(a)(1).  Plaintiffs have not contended that the investment directions implemented by BNY Mellon were not made "in accordance with the terms of the plan."  No evidence has been presented that the directions were not made in accordance with the terms of the plan.  Therefore, this is not a basis for a claim against BNY Mellon for a breach of its duties as directed trustee.[15] Moreover, Plaintiffs have not asserted that BNY Mellon followed a direction that was "contrary to" ERISA.  The Court agrees that, based on the facts of this case, these arguments cannot support a claim for breach of fiduciary duty by BNY Mellon.

## 2. BNY Mellon Did Not Fail to Follow "Proper Directions" of the Named Fiduciary

The Court also concludes that BNY Mellon did not breach its fiduciary duties under ERISA by failing to follow "proper directions" of the named fiduciary.  *See id.*  Plaintiffs suggest that BNY Mellon could have and should have transferred the subject funds externally to LSV International on the basis of the investment directions provided, even in the absence of wire transfer instructions. This view is misplaced for a number of reasons.  Most fundamentally, WellSpan failed to provide BNY Mellon with wire transfer instructions to wire funds outside of the bank for the LSV International investment.  BNY Mellon could not do so in the absence of a valid investment direction.  The signed letter directing the transfer of $15 million to the LSV International account contained a written authorization only to transfer funds from the Cashflow account to the LSV

---

[15] As noted above, the CARS team at BNY Mellon did not have access to the Master Trust Agreement.  It is unclear what, if any, protocol CARS team members followed to ensure that investment directions complied with the terms of the Plan without access to the governing plan document.  In any event, since the instructions here complied with the terms of the Plan, it is unnecessary for the Court to examine the question.

International account; there was no written, signed authorization to transfer funds from the LSV International account to LSV's custody bank.  By contrast, the instruction provided with respect to Artisan Partners did include such instructions.  The Master Trust Agreement, and the Authorization Letter, required that any investment directions be made in writing and be signed by an authorized officer.  Plaintiffs rely heavily on the text in the separate letter related to the Artisan Partners investment to "Please consider this authorization to initiate the funding to the above managers on July 24, 2013."  The Court has found that the statement was not intended to be a reference to LSV International.  In any event, no signed direction was provided to BNY Mellon directing a wire transfer outside of the bank for LSV International.  In fact, given the Master Trust Agreement's requirement that investment directions be in writing, an external transfer of funds in the absence of such written authorization would arguably be contrary to the Plan and, therefore, a violation of BNY Mellon's fiduciary duties under ERISA.

Plaintiffs also argue that WellSpan did not need to provide wire transfer instructions for the direction at issue because BNY Mellon could implement certain kinds of transfers without the need for wire transfer instructions.  This argument falls short.  BNY Mellon maintained wire transfer instructions for certain "repetitive" instructions, described in the Authorization Letter as instructions for "[p]ayments for portfolio fund managers, trustees/ custodians or investment consultants."  However, repetitive instructions were not available for equity investments.  The Authorization Letter clearly distinguished between "Asset Transfers and Investments" and "Payments and Distributions," permitting the use of standing wire transfers instructions only for repetitive instructions in connection with the latter category.  The proposed investment in LSV International was just that—an "investment"—and, therefore not eligible for the process available for repetitive transfers.  Plaintiff's position that they believed that repetitive transfer instructions were available under these circumstances is sadly, credible, but at the same time surprising given the facts of the case.  WellSpan's Senior Vice President Mr. O'Connor executed the Authorization

Letter directing differing treatment of investments from payments, permitting the use of repetitive instructions only for the latter, not the former—yet Plaintiffs argue in this case that BNY Mellon violated its duties by complying with that direction.  The position is still more surprising, given Ms. Bognar's October 5, 2010 call with Mr. McCoy, in which she informed him that passive managers cannot be funded using "standing instruction[s]," and that transfers of funds to such managers required wire transfer instructions.  Add to that the several other instances in which BNY Mellon reached out to WellSpan for wire transfer instructions before implementing external transfers. Finally, to the extent Plaintiffs' argument relies on a single example in January 2008 in which an external transfer of funds was apparently effectuated without wire transfer instructions because such instructions were on file, this single instance is insufficient support for their position in light of the numerous later instances, such as the October 5, 2010 phone call between Ms. Bognar and Mr. McCoy, which made explicit that BNY Mellon would not transfer funds externally without wire transfer instructions from WellSpan.

### 3.  Plaintiffs' "Course of Performance" Argument Fails

The Court cannot find any of the recognized bases for a breach of fiduciary duty by a directed trustee on these facts:  BNY Mellon did not breach a fiduciary duty by carrying out a direction that was contrary to ERISA or made not in accordance with terms of the plan; nor did it fail to carry out a proper direction of the named fiduciary.  However, the Court evaluates whether BNY Mellon nevertheless breached a fiduciary duty, or its obligation to act prudently in the exercise of those duties, because Mr. Buczynski failed to take steps subsequent to his callback with Mr. Harley to ensure that WellSpan's desired investment in LSV International was ultimately effectuated. Plaintiffs assert a number of arguments in support of their position that BNY Mellon indeed breached a duty by failing to take such additional steps.  Unfortunately, while recognizing both that Mr. Buczynski was aware that WellSpan intended to move their money to LSV International equity ultimately, and that WellSpan's officials labored under a misunderstanding of the allocation of

responsibilities between a named fiduciary and a directed trustee, these arguments fail.

Plaintiffs argued in their pretrial submissions and at trial that a course of performance between WellSpan and BNY Mellon imposed on BNY Mellon an obligation to reach out to WellSpan to request the wire transfer instructions needed to move the $15 million in Plan assets from BNY Mellon to LSV's custody bank.  On this point, Plaintiffs argued in their pretrial submissions that "BNY Mellon knew when it needed wire transfer instructions to execute investment instructions and when it did not.  But BNY Mellon never gave WellSpan a clear and uniform list of when wire transfer instructions were or were not needed."  Plaintiffs' Pretrial Memorandum of Law (Dkt. No. 67), at 3.  Plaintiffs point out that the Account Schematic "says nothing about wire transfer instructions for any of the investment managers referenced in the chart."  *Id.*  Plaintiffs contend that, in light of BNY Mellon's knowledge and WellSpan's lack of knowledge of when wire transfer instructions were needed, "BNY Mellon . . . consistently alerted the Plan, either verbally or in writing (generally by e-mail) when wire transfer instructions were needed."  *Id.* at 4.

While it may have been good customer service to do so, BNY Mellon did not, as a directed trustee, have a responsibility under ERISA to educate WellSpan about how to prepare investment instructions or to advise WellSpan on an unsolicited basis regarding how best to implement their intentions.[16]  There is simply no support for such a position in ERISA or the case law interpreting it. As described above, the duties of a directed trustee are limited to the categories described in the statute.  By not imposing liability on BNY Mellon under these circumstances, ERISA does not leave plan participants unprotected.  As the Department of Labor noted in its field assistance bulletin, several "considerations counsel in favor of" the view that the duties of a directed trustee are limited,

---

[16] Plaintiffs similarly suggested during trial that, because the Master Trust Agreement does not make reference to wire transfer instructions, Plaintiffs did not have an obligation to provide them in the relevant investment instructions to BNY Mellon.  This argument is rejected for the same reason that Plaintiffs' course of performance argument is rejected.

including the fact that "ERISA section 404 requires the instructing fiduciary to adhere to a stringent standard of care."  DOL Field Assistance Bulletin 2004-3.  Plaintiffs may have had a "lack of knowledge," as they state, but they, not BNY Mellon, were the instructing, named fiduciaries.  And Plaintiffs had years to learn how the investment process worked, including which investments required wire transfer instructions, but they did not do so.  Mr. McCoy was expressly told that investments in LSV International required wire transfer instructions.  It would be unreasonable to conclude that, because the Account Schematic did not reflect which investments required wire transfer instructions and which did not, Plaintiffs' lack of knowledge as named fiduciaries imposed on BNY Mellon a fiduciary obligation to fill the interstices their knowledge.

Furthermore, the fact that BNY Mellon provided a higher level of customer service in the past did not impose upon it a statutory duty to act, for all time, with a higher standard of care.  Rather, BNY Mellon needed only to act consistently with those duties imposed by ERISA itself and any contract between it and WellSpan:  "ERISA does not impose Good Samaritan liability" and a "financial institution cannot be deemed to have volunteered itself as a fiduciary simply because it undertakes . . . responsibility that exceeds its official mandate."  *F.W. Webb Co.*, 2010 WL 3219284, at *9 (quoting *Beddall v. State Street Bank and Trust Co.*, 137 F.3d 12, 21 (1st Cir. 1998)).  It is clear to the Court that after Ms. Conner left BNY Mellon, the level of customer service to which WellSpan was accustomed decreased.  But that is not sufficient to impose liability on BNY Mellon in the absence of a statutory or contractual basis to conclude that BNY Mellon had a fiduciary responsibility to provide the higher level of service.  Indeed, were the Court to accept Plaintiffs' argument on this point, "[p]roviders of . . . limited services would . . . necessarily increase their fees to account for the risk that, despite the clarity of their contract, they will be assigned . . . other fiduciary liability . . . ."  *Id.* at *10.  But "[a]ll ERISA constituents—plans, beneficiaries, and service providers—would better benefit from a rule allowing them to contract for the services they actually desire."  *Id.*  As a result, the alleged course of performance between WellSpan and BNY Mellon

could not have served to expand BNY Mellon's fiduciary duties, and is not a sufficient predicate on which to base the conclusion that BNY Mellon breached a fiduciary duty under ERISA by not requesting wire transfer instructions for the external placement of funds with LSV even though it may have done so under similar circumstances in the past.[17]

### 4.   BNY Mellon Had No Duty to Follow Up with WellSpan Nor a Duty to Assess the "Prudence" of the Investment Directive

Plaintiffs argue that Mr. Buczynski knew wire transfer instructions were needed to ensure the funds were placed externally with LSV and that "BNY Mellon had an affirmative duty to disclose that information to WellSpan and breached its fiduciary duties by remaining silent."  Pl. Pretrial Memo at 13.  But there is no legal support for the imposition of such an "affirmative duty." Simply put, the directed trustee provisions of ERISA did not require that Mr. Buczynski "keep tabs" on whether his client's down-the-road intentions with respect to investment of funds were fulfilled after execution of a clear investment directive.  Mr. Buczynski was presented with an unambiguous instruction to transfer funds from one account to another, and that is what he did.  The Court has found that Mr. Buczynski understood the instruction as clear; he had no question regarding how and whether to implement it.  Thus, Plaintiffs' argument that "BNY had a fiduciary duty to alert WellSpan about any alleged deficiency in the instructions," Pl. Pretrial Memo at 13, is misplaced for the simple reason that there were no deficiencies in the instructions, and that Mr. Buczynski did not perceive any.  Thus, the Court rejects Plaintiffs' proposed conclusion that "an objectively prudent fiduciary would not have interpreted the Plan's July 2013 Investment Instructions as requesting to either delay the investment or to simply move the Plan assets from one cash account to another," Pl. Proposed Conclusions of Law ¶ 233, and finds that ERISA imposed no duty on Mr. Buczynski beyond execution of the clear investment directive.

---

[17] The Court notes again the apt conclusion by Mr. Mull:  "Best Practice would be to follow up but that does not mean we must follow up."

Plaintiffs also maintain that it was not "prudent" for "BNY Mellon to reallocate $15 million from one cash account to another, an 'investment' decision that makes no sense given the context of the Plan and the direction given."  Pl. Pretrial Memo at 12.  Plaintiffs further argue that "[n]o prudent trustee could have thought WellSpan wanted to pointlessly transfer millions of dollars from account to account only to end up in the very same money market fund."  *Id.*  These arguments are not well-founded as applied to BNY Mellon here, and misconstrue the application of ERISA's prudence standard to a directed trustee.  As discussed above, the circumstances under which a directed trustee must question the wisdom of an investment instruction by exercising independent judgment are extremely limited, and Plaintiffs have not argued that any of those circumstances were present in this case.  WellSpan's instruction to move the funds without concurrent instructions to wire them to LSV, as with WellSpan's failure to notify LSV of the expected investment, may have been imprudent, even bad investment decisions, but as a directed trustee, BNY Mellon was not obligated to advise the named fiduciary that its investment direction was imprudent:  BNY Mellon had no obligation to second-guess the wisdom of WellSpan's instruction regarding the $15 million, and to reach out and suggest that they do something differently.[18]

### 5.  Plaintiffs Could Not Unilaterally Impose Higher Duties on BNY Mellon

Plaintiffs also argued in their pretrial submissions and at trial that, because Mr. Harley's fax to Mr. Buczynski instructed Mr. Buczynski to request additional information if needed, BNY Mellon breached its fiduciary duties in not requesting wire transfer instructions from WellSpan.  *See, e.g.*, Pl. Pretrial Memo at 6 ("The direction to request additional information if needed appeared *three* separate times in the July 2013 Investment Instructions."); *id.* at 9 ("BNY Mellon was directed—*three* times—to contact WellSpan if it needed 'additional information.'  Mr. Buczynski knew he needed

---

[18]  The Court observes that, as noted above, the Plan held millions of dollars in cash equivalents at the end of each of July and August 2013 in addition to the $15,000,000 held in the LSV International account.  Plaintiffs do not claim that the Plan's failure to invest those sums in higher yielding assets was the responsibility of BNY Mellon.  Here the Court notes the observation by BNY Mellon's Ms. Beck:  "Also if they don't notice the cash being invested in their sweep vehicle rather than a fund for 3 months, that is a problem on their end, not ours."

wire transfer instructions to execute WellSpan's instructions yet failed to request them despite the Plan's clear direction that he should contact [] WellSpan for any additional information he needed."). The Court has found that Mr. Buczynski concluded that he did not need any additional information from WellSpan, as the directive to transfer funds from the Cashflow account to the LSV International account was clear on its face, and he believed that no additional information or clarification was necessary in order to execute the instruction.  Therefore, as a factual matter, Mr. Buczynski did not fail to comply with these requests.

The Court questions the legal premise behind Plaintiffs' argument, which is unsupported by the statute or precedent.  Plaintiffs essentially argue that by adding a request to the directed trustee in an unsigned fax cover sheet and letters signed by Mr. McCoy without countersignature by the bank, to call "if you have any questions or require additional information," they effectively transferred their fiduciary duties as named fiduciary to prepare proper instructions, to the directed trustee.  Such casual, unilateral requests seem thin reeds on which to base such a significant reallocation of duties to a directed trustee.  If WellSpan wished to impose on BNY Mellon greater duties than those supplied by statute, it might have done so through an amendment to the Master Trust Agreement, which might then allow it to credibly argue that BNY Mellon had taken some action "not in accordance with the terms of the plan."  But the Court is hesitant to find that WellSpan can effectively reallocate such duties unilaterally by letter and unsigned fax.  In the absence of authority supporting that conclusion, the Court cannot conclude that those requests effectively imposed additional fiduciary duties upon BNY Mellon, or that they triggered a duty of prudence on its part to follow up.

## III.   CONCLUSION

While the level of customer service provided by BNY Mellon's CARS team declined following Ms. Conner's departure from the bank, the bank's response to the investment directions provided by WellSpan in July 2013 did not fall below the floor imposed by ERISA.  BNY Mellon's

representative, Mr. Buczynski, carried out the directives presented to him, and ERISA imposed no duty on him or BNY Mellon to take additional steps to ensure that WellSpan's intentions—which were not effectively implemented by their instructions—were ultimately achieved.  The reduction of BNY Mellon's level of customer service had consequences; in part as a result, they lost a customer. But because the duties of a directed trustee are significantly limited by statute, BNY Mellon is not liable for a violation of ERISA.[19]

The Clerk of Court is directed to enter judgment in favor of Defendant, to terminate all pending motions, and to close this case.

SO ORDERED.

Dated:  January 9, 2017
New York, New York

_____
GREGORY H. WOODS
United States District Judge

---

[19] The duties of a named fiduciary are not so limited.  The Court makes no finding on this question, but the decline in BNY Mellon's level of customer service may have left exposed gaps in WellSpan's controls; Plaintiffs' claim here rests in part on their asserted "lack of knowledge."  This question is not before the Court.